

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
07/15/2016

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **HOWARD LIAO,** | § | **Case No. 15-36257** |
| | § | |
| Debtor. | § | **Chapter 7** |
| | § | |

**MEMORANDUM OPINION REGARDING THE OBJECTIONS BY**
**SOCA FUNDING, LLC AND THE TRUSTEE TO THE DEBTOR'S**
**CLAIMED HOMESTEAD EXEMPTION**
**[Doc. Nos. 99 & 141]**

### I. INTRODUCTION

In Texas, broad protection is given to homesteads—even if the debtor asserting the homestead exemption has acted in bad faith. *In re McDaniel*, 70 F.3d 841, 843 (5th Cir. 1995). Indeed, the recent Supreme Court decision in *Law v. Siegel*, 134 S. Ct. 1188 (2014), further insulates misbehaving debtors from losing their homestead exemptions. Yet, such debtors are still not completely immune from a successful attack on their homestead exemptions. The case at bar illustrates why.

The dispute here is between Howard Liao, the debtor (the "Debtor"), and SOCA Funding, LLC ("SOCA"), a creditor and party-in-interest in the above-captioned Chapter 7 case; and between the Debtor and Eva Engelhart, the Chapter 7 trustee (the "Trustee"). The Debtor initiated this case on November 30, 2015. On December 11, 2015, he filed his original schedules, and claimed a homestead exemption in a particular piece of property. [Doc. No. 8]. On January 26, 2016, the Debtor filed amended schedules to change his claimed homestead exemption. [Doc. No. 66]. On March 8, 2016, SOCA filed an objection to the Debtor's claimed exemption. [Doc. No. 99]. This Court held a hearing on this objection on June 8, 2016, and then continued this

1

hearing.   On June 13, 2016, the Trustee filed her own objection to the Debtor's claimed exemption, [Doc. No. 141]; and on June 27, 2016, this Court held a simultaneous hearing on both the continued hearing on SOCA's objection and the initial hearing on the Trustee's objection. The Court then took the matter under advisement.

This Court now makes the following Findings of Fact and Conclusions of Law under Federal Rule of Civil Procedure 52, as incorporated into Bankruptcy Rules 7052 and 9014.  To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such; and to the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such.[1]  Further, this Court reserves the right to make additional findings and conclusions as it deems necessary or as requested by any party.  For the reasons set forth herein, this Court sustains SOCA's objection and the Trustee's objection.

## II. FINDINGS OF FACT

1.   On August 1, 1988, in Harris County, Texas, the Debtor and his two brothers-in-law and two family friends—Yung Hua Lin, Young-Kai Lin, Kuo Shen Yeh, Fu Kuo Yeh (the "1988 Partners")—formed a partnership named Master Investment Group, a Texas General Partnership (the "MIG Pship").   [Finding of Fact No. 1 in the FOF & COL]. This partnership was memorialized in writing through a partnership agreement signed on

---

[1] This Court has the right in issuing its ruling today to use testimony and exhibits from prior hearings in this case. *See, e.g., In re Acequia, Inc.*, 787 F.2d 1352, 1358–59 (9th Cir. 1986) (holding that a bankruptcy court is not precluded "from considering evidence presented by the parties at prior evidentiary hearings . . . [and that] [t]o require the bankruptcy court to ignore prior evidence would impose a harsh and unnecessary administrative burden."); *Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer)*, 95 B.R. 143, 146 (B.A.P. 9th Cir. 1988) (acknowledging that "a bankruptcy judge may, but need not, consider evidence from a prior hearing in the same case"). This Court held hearings on December 15, 2015 and January 8, 2016 regarding the nature of the entity known as "Master Investment Group" (i.e., Is it a DBA or a partnership?) and who owns the Elderberry Property (i.e., the Debtor himself or the entity known as Master Investment Group?). The Court refers to certain testimony given and attorneys' statements made at these two hearings to make certain findings of fact regarding the dispute presently at bar.  Moreover, this Court issued findings of fact and conclusions of law on April 15, 2016 when it granted SOCA's motion to convert this case from a Chapter 11 to a Chapter 7 (the "FOF & COL").  [Doc. No. 126]. The Court adopts several of the findings of fact set forth in the FOF & COL for the purposes of ruling on the pending dispute; and reference herein to the FOF & COL is a reference to these particular findings and conclusions.

December 6, 1989. [*Id.*]. The MIG Pship's purpose was to manage, operate and sell the property located 5850, 5860, 5870, and 5880 Ranchester (the "Ranchester Property"), Harris County, Texas. The Ranchester Property is comprised of various rental properties. [*Id.*].

2.  In August 1988, the Debtor purchased certain real property located at 3810 Belle Grove Lane, Sugar Land, Texas 77479 (the "Belle Grove Property"). [Debtor's Ex. No. 5, p. 1, No. 2]; [Hr'g Tr. 27:21–25, June 8, 2016]. At the time the Debtor purchased the Belle Grove Property, he was married, and therefore, this property was community property. [Hr'g Tr. 69:17–25, June 8, 2016]. When the Debtor obtained a divorce in 2002, he paid his ex-wife a certain sum of money in exchange for her interest in the Belle Grove Property. [Hr'g Tr. 69:19–70:15, June 8, 2016]. The deed to the Belle Grove Property has always been in the Debtor's name since the purchase of the property in August 1988. [Hr'g Tr. 69:10–16, June 8, 2016].

3.  The Debtor resided at the Belle Grove Property from August 1988 through September 2012. [Hr'g Tr. 84:15–85:1, June 8, 2016].

    a.  On July 15, 2013, the Debtor, in the capacity as the landlord, entered into a residential lease with Kauther Kateeb Odat ("Odat"), as the tenant, by which the Debtor leased the Belle Grove Property to Odat. [Trustee's Ex. No. 10]. The lease, effective upon July 15, 2013, was to expire on June 30, 2014, and was to be automatically renewed unless the Debtor or Odat provided the other party with written notice of termination. [*Id.*]. Pursuant to the lease, Odat could only use the property as a private residence. [*Id.*]. Odat made monthly lease payments to the

Debtor from August 10, 2013 through April 15, 2014. [Trustee's Ex. No. 11]. He did not renew this lease.

b. On November 1, 2015, the Debtor, in the capacity as the landlord, entered into a residential lease with Zhuling Gong ("Gong"), as the tenant, by which the Debtor leased the Belle Grove Property to Gong for a period of two years. [Trustee's Ex. No. 9]; [*see* Hr'g Tr. 49:16–50:11]. The lease was to be automatically renewed unless the Debtor or Gong provided the other party with written notice of termination. [Trustee's Ex. No. 9]. Pursuant to the lease, Gong could only use the property as a private residence. [*Id.*]. However, Gong never moved into the Belle Grove Property. [*See* Hr'g Tr. 50:5–11, June 8, 2016].

c. The Debtor has always maintained the utilities in his name, except when he leased the Belle Grove Property to Odat from July of 2013 to June of 2014. [Trustee's Ex. No. 13]; [Hr'g Tr. 53:5–54:5, June 8, 2016].

d. In 2013, 2014, and 2015—despite not using the Belle Grove Property as his principal residence—the Debtor received a lower real property tax rate for the property by representing that the Belle Grove Property was his homestead. [Hr'g Tr. 85:2–86:2, June 8, 2016].

4. On July 20, 2000, the Debtor and his three siblings in Taiwan—Shu Hua Liao, Kotatsu Yasukawa, and Ho Chang Liao (the "Siblings")—executed a Trust Agreement (the "July 20 Trust Agreement"). [Finding of Fact No. 2 in the FOF & COL]. According to the Debtor, the July 20 Trust Agreement reflects his intent—and the intent of the Siblings—for all four of them to be partners in the MIG Pship. [*Id.*].

4

5.     On January 8, 2003, the Debtor and the Siblings executed an Addendum to the July 20 Trust Agreement. [Finding of Fact No. 3 in the FOF & COL]. According to the Debtor, the Addendum is "a kind of announcer. In my family this is the percentage of share for every member." [*Id.*]. Stated otherwise, this Addendum is further evidence that, in the Debtor's mind, the Siblings were partners of the MIG Pship in 2003, and that each of them have a definite percentage of ownership in this partnership. [*Id.*]. Moreover, the Addendum gave the Debtor 45% of all income generated by the Ranchester Property "on an annual basis upon [the Siblings'] approval and discretion." [*Id.*]. The Debtor was given this 45% income interest by the Siblings because he was managing the Ranchester Property. [*Id.*].

6.     On or about February 20, 2003, the Debtor bought out the partnership interests of the MIG Pship owned by the 1988 Partners (i.e. two brothers-in-law and two family friends). [Finding of Fact No. 4 in the FOF & COL]. The Debtor was able to buy out their interests through cash infusions received from the Siblings. According to the Debtor, the Siblings wired the funds necessary to buy out the 1988 Partners. [*Id.*]. Upon receipt of their cash payments, the 1988 Partners assigned their respective interests in the MIG Pship to the Debtor. [*Id.*]. Consequently, as of February 20, 2003, the 1988 Partners no longer had any interest in the MIG Pship. [*Id.*].

7.     Also, on or about February 20, 2003, the Debtor purchased the Ranchester Property from the MIG Pship, and he was able to do so, in part, by obtaining financing from Texas First National Bank. [Finding of Fact No. 5 in the FOF & COL].

8.     On May 21, 2007, a judgment was entered against the Debtor by the District Court of Clark County, Nevada in favor of Mandalay Corp. dba Mandalay Bay Resort and Casino

and Treasure Island Corp. ("Mandalay") for $419,694.06 (the "Judgment"). [Finding of

Fact No. 6 in the FOF & COL]. At the hearing held in this Court on March 4, 2016 on

SOCA's motions to convert, the Debtor admitted that the Judgment arose from his

gambling:

> Q: This is for your personal gambling debts, two gambling debts, right?
> A: Yes, sir.

[*Id.*].

9.    Mandalay filed an Abstract of Judgment in Fort Bend County, Texas. [Finding of Fact

No. 7 in the FOF & COL]. This Abstract of Judgment expressly references the

Judgment, and expressly refers to the Debtor as the name of the defendant against whom

the Judgment was taken. [*Id.*].

10.   On August 30, 2012, Farid and Asha Virani conveyed 6 Elderberry Tree, Sugar Land,

Texas 77489 (the "Elderberry Property") to the Debtor for the sum of $950,000.00.

[Finding of Fact No. 8 in the FOF & COL]. The Debtor's siblings contributed

$190,000.00 of the purchase price, and the MIG Pship contributed approximately

$260,000.00 of the purchase price. [*Id.*]. Although the deed to the Elderberry Property

was initially put in the Debtor's name, this property was eventually conveyed to and

titled in the name of the MIG Pship. [Findings of Fact Nos. 8 & 17 in the FOF & COL].

11.   There is no question that there is equity in the Elderberry Property. According to

Schedule A filed by the Debtor on December 11, 2015 in this case, the value of this

property as of November 30, 2015 was $1,106,000.00, and the amount of the first lien

held by Golden National Bank was $432,484.54. [Doc. No. 8, p. 2 of 44]. According to

this same Schedule A, there are *ad valorum* tax liens owing of $12,139.54. [*Id.* at p. 8 of

44]. Thus, the amount of equity totals $661,375.92.

12.  In September 2012, the Debtor moved out of the Belle Grove Property and into the Elderberry Property. [Hr'g Tr. 61:6–19, June 8, 2016]. The Debtor moved into the Elderberry Property because the Siblings asked him to do so in order to maintain this property—which the Siblings and the Debtor consider as investment property. [*Id.*].

13.  The Debtor has always maintained the utilities at the Elderberry Property in his name since the date of purchase (i.e., since August 30, 2012). [Trustee's Ex. No. 12].

14.  On November 8, 2012, the Debtor conveyed the Elderberry Property to the MIG Pship for $10.00 in a general warranty deed. [Finding of Fact No. 10 in the FOF & COL]. The deed itself refers to "Master Investment Group" as the grantee—as opposed to "Master Investment Group, a partnership"—but the Debtor testified that it was the MIG Pship that was the owner of the Elderberry Property. [*Id.*].

15.  On March 13, 2013, the MIG Pship reconveyed the Elderberry Property back to the Debtor for $10.00 in a general warranty deed. [Finding of Fact No. 11 in the FOF & COL]. Thus, on March 13, 2013, the Debtor once again owned the Elderberry Property.

16.  On March 25, 2013, Mandalay assigned the Judgment to SOCA. [Finding of Fact No. 12 in the FOF & COL]. SOCA therefore became the owner and holder of the Judgment, and therefore obtained the right to collect the sums due and owing under the Judgment.

17.  And, indeed, SOCA took steps to collect the sums due and owing under the Judgment. SOCA obtained a Writ of Execution on the Ranchester Property—which the Debtor owned at this time, [Finding of Fact No. 7], and on July 10, 2013, the Constable of Harris County, Texas issued a "Constable Sale" notice setting forth that there would be a sale of the Ranchester Property to be conducted by the Constable of Precinct 5, Harris County, Texas, [Finding of Fact No. 13 in the FOF & COL].

18.    The Constable of Precinct 5 of Harris County, Texas did, in fact, hold a sale of the Ranchester Property.   And, on December 3, 2013, SOCA purchased the Ranchester Property for $255,000.00 at this sale.   The Constable executed a deed for the benefit of SOCA. [Finding of Fact No. 14 in the FOF & COL].

19.    After SOCA purchased the Ranchester Property, there were still sums due and owing under the Judgment.   Accordingly, SOCA next sought to have a Constable of Fort Bend County, Texas conduct a sale on the Elderberry Property, as the Debtor held title to this property after the conveyance made on March 13, 2013.   [Finding of Fact No. 15 in the FOF & COL].

20.    In December of 2014, the Debtor and the Siblings filed suit in Fort Bend County, Texas district court seeking to enjoin SOCA from foreclosing on the Elderberry Property. [Finding of Fact No. 16 in the FOF & COL].   This suit was subsequently dismissed without prejudice.  [*Id.*].

21.    On May 11, 2015, the Debtor conveyed the Elderberry Property back to the MIG Pship for $10.00 in a warranty deed.  [Finding of Fact No. 17 in the FOF & COL].   The warranty deed that the Debtor signed expressly refers to the grantor as "Howard Liao" and the grantee as "Master Investment Group, a partnership." [*Id.*].   Thus, as of May 11, 2015, the MIG Pship owned the Elderberry Property.

22.    At some point prior to November 30, 2015, the Constable of Fort Bend County, Texas, gave notice that he would hold a foreclosure sale of the Elderberry Property on December 1, 2015.  [Finding of Fact No. 18 in the FOF & COL].   This scheduled foreclosure sale was instigated at the request of SOCA.  [*See* Hr'g Tr. 5:7–6:10; 9:12–19, Dec. 15, 2015].

23.     On November 30, 2015 (the "Petition Date"), at 12:08 p.m., the Debtor filed a voluntary

Chapter 11 petition, and this petition represents that the name of the debtor is "Howard

Liao" (the "Liao Petition"). [Doc. No. 1]. The Debtor signed this petition as simply

"Howard Liao." [*Id.* at p. 3 of 5]. In addition, on this petition, Margaret McClure

("McClure") signed as the Debtor's attorney. [*Id.*]. The social security number set forth

on this petition is the Debtor's social security number. [*Id.* at p. 1 of 5].

24.     McClure gave the Liao Petition to the Deputy Constable who was scheduled to conduct

the foreclosure sale on the Elderberry Property. [Finding of Fact No. 20 in the FOF &

COL]. However, the Deputy Constable informed McClure that the Debtor's personal

bankruptcy did not automatically stay the foreclosure sale because the Elderberry

Property was owned by an entity known as "Master Investment Group," not by the

Debtor personally. [*Id.*]. The Deputy Constable informed McClure that unless she

presented him with a bankruptcy petition for "Master Investment Group," he would

proceed with the foreclosure sale on December 1, 2015. [*Id.*].

25.     After the Deputy Constable made this statement to McClure, she immediately prepared

another bankruptcy petition and, at 1:37 p.m. on November 30, 2015, the Debtor and his

counsel signed and filed a second Chapter 11 petition, representing that the name of this

debtor was "Master Investment Group (d/b/a)" (the "Liao *dba*MIG Petition"). [Findings

of Fact Nos. 8 & 9 in the FOF & COL]. The Liao *dba*MIG Petition also included the

Debtor's social security number, i.e., the same social security number used on the Liao

Petition. [Case No. 15-36276, Doc. No. 1]. The Debtor signed the Liao *dba*MIG Petition

as "Howard Liao, Owner." [*Id.* at p. 3 of 3]. Thus, this particular petition initiated the

bankruptcy of a business called "Master Investment Group," and this business was

represented as a d/b/a of the Debtor, **not** as the partnership known as the MIG Pship.  At the time the Debtor signed the Liao *dba*MIG Petition in the name of "Howard Liao d/b/a Master Investment Group," he knew that the entity known as "Master Investment Group" was not his d/b/a, but rather was—and still is—a Texas partnership in which he and the Siblings are the partners.  [Hr'g Tr. 36:7–40:3, Dec. 15, 2015].  Indeed, the Debtor knew full well that the Siblings and he had been partners of the MIG Pship for several years.  [*See* Findings of Fact Nos. 4 & 5].  And, at the time the Debtor signed this petition, he also knew that the partnership—and not he, individually—owned the Elderberry Property.  [Hr'g Tr. 134:20–23, Jan. 8, 2016]; [*see also* Finding of Fact No. 21].

26.  The filing of the Liao *dba*MIG Petition was successful in stopping the foreclosure sale on the Elderberry Property, as the Deputy Constable of Fort Bend County, Texas—seeing the name of "Master Investment Group" on the bankruptcy petition provided to him by Debtor's counsel—decided not to go forward with the scheduled foreclosure sale for fear of violating the automatic stay imposed by the Code.  [*See* Trustee's Ex. No. 3, pp. 11–13].  The Liao *dba*MIG Petition was expressly filed to stop the foreclosure on the Elderberry Property.  [Finding of Fact No. 22 in the FOF & COL].  Indeed, in open court, McClure made the follow statements: "The constable was not going to shut down the foreclosure unless Master Investment Group also filed a chapter or bankruptcy."  [*Id.*].  "My constable, that I spoke to, was not going to pull the foreclosure."  [*Id.*].  "I succeeded in stopping the foreclosure . . . I filed two petitions . . . in my mind for the same person."  [*Id.*].

27.  On December 1, 2015, the Debtor filed motions to consolidate (the "Motions to Consolidate") in the pending case and in case number 15-36276 (i.e., the case initiated by

the filing Liao *dba*MIG Petition).  [Finding of Fact No. 23 in the FOF & COL].   In each

of these motions, the following representation was made:

> Debtors' counsel [i.e. McClure] is well aware that the filing of a chapter
> 11 proceeding on behalf of an assumed name [i.e. Master Investment
> Group (d/b/a)] is improper, but believes that it would have been
> malpractice if she did not file the chapter 11 proceeding for Master
> Investment Group since she understood that the Deputy Constable would
> proceed with the sale [of Elderberry] and Soca Funding, LLC would force
> the sale. *By filing that proceeding [i.e. case number 15-36276], it
> guaranteed that Mr. Liao's homestead would not be sold for the benefit of
> the judgment creditor.*

[*Id.*] (emphasis added).

28.     On December 11, 2015, the Debtor filed his schedules in the first case that he initiated by

the filing of the Liao Petition.  [Doc. No. 8].  On his Schedule A, he represented under

oath that as of the Petition Date, he owned the Elderberry Property as well as the Belle

Grove Property.  [Finding of Fact No. 24 in the FOF & COL].  He also represented under

oath that the Elderberry Property was his homestead and that the Belle Grove Property

was a "rent house."  [*Id.*].  In his Schedule B, he represented that he held a 100%

ownership interest in a d/b/a known as "Master Investment Group." [*Id.*].  Further, in his

Schedule B, the Debtor checked the box marked "NONE" in responding to item number

14, which required him to disclose any interest in any partnerships. [*Id.*].  Thus, the

Debtor represented that he had no interest in any partnership as of the Petition Date.

Finally, the Debtor made a similar representation in his answer to item number 18 on the

Statement of Financial Affairs that he filed on November 30, 2015.  [*Id.*].  Specifically,

he failed to disclose that he was a partner in the MIG Pship, and instead, represented that

his business was "d/b/a Master Investment Group."  [*Id.*].

29.     On December 15, 2015, this Court held a hearing at which time SOCA raised the issue

about whether the entity known as "Master Investment Group" was a d/b/a or was really a partnership formed under Texas law.  [Finding of Fact No. 25 in the FOF & COL]. Additionally, at this hearing, the Debtor's attorney, McClure, represented to this Court three times that the Elderberry Property was the Debtor's homestead.  Specifically, McClure made the following statements:

a.  In open court at the hearing on December 15, 2015, McClure's first statement about the Elderberry Property was as follows: "They [i.e., SOCA] bought a judgment several years ago and were attempting to foreclose on what turned out to be Mr. Liao's homestead which is listed on Schedule A as '6 Elderberry Trace, Sugar Land, Texas.' " [Hr'g Tr. 5:7–10, Dec. 15, 2015].

b.  Her second statement regarding the Elderberry Property was as follows: "They both understood and again, I had to protect the homestead of Howard who is—has signed his schedules under penalty of perjury stating that that home is his homestead at 6 Elderberry Trace, Sugar Land, Texas."  [Hr'g Tr. 6:16–20, Dec. 15, 2015].

c.  Her third statement concerning the Elderberry Property was as follows: "I'm here today asking for the Court's understanding that as a lawyer, I had to protect my client by filing the one [i.e., petition] in the name of the d/b/a even though I know that that's not proper, but it had to be done to stop the Constable sale of Howard's homestead."  [Hr'g Tr. 6:25–7:4, Dec. 15, 2015].

30.  On January 5, 2016, the Debtor amended the Liao *dba*MIG Petition he had filed, and this amended petition represented that the entity in bankruptcy actually bears the name of

"Master Investment Group, a General Partnership," **not** of a d/b/a owned by the Debtor himself. [Case No. 15-36276, Doc. No. 46]; [Finding of Fact No. 26 in the FOF & COL].

31.     On January 8, 2016, this Court held a hearing during which various attorneys who had previously represented—or still are representing—the entity known as "Master Investment Group" gave testimony about the nature of this entity.   The Court held this hearing due to the concerns that this Court developed at the hearing held on December 15, 2015 about the Debtor filing the Liao *dba*MIG Petition to stop the foreclosure that had been scheduled for December 1, 2015 on the Elderberry Property.

32.     On January 11, 2016, SOCA filed a motion to convert both of the Chapter 11 cases the Debtor had initiated on the grounds that the Debtor had acted in bad faith.   [Finding of Fact No. 28 in the FOF & COL].   On January 12, 2016, SOCA filed an amended motion to convert each of these cases to Chapter 7.   [*Id.*].   Specifically, SOCA argued that the Debtor, in his personal case and in the MIG Pship case, acted in bad faith because he "repeatedly transferred assets as part of a shell game to defraud SOCA (and presumably other creditors)."   [Doc. No. 58, p. 4 of 6]; [Case No. 15-36276, Doc. No. 57, p. 4 of 6].

33.     On January 26, 2016, the Debtor filed amended schedules in the first case that he initiated by the filing of the Liao Petition.   Specifically, he amended Schedule A and Schedule C, representing that as of the Petition Date, he did ***not*** own the Elderberry Property and that the Belle Grove Property (not the Elderberry Property) was his homestead.   [Finding of Fact No. 29 in the FOF & COL].   The Debtor claims his homestead exemption under Texas state law.   [Trustee's Ex. No. 2].   The amended Schedule A indicates that the Belle Grove Property has a value of $ 481,700.00, and the amended Schedule D indicates that the Belle Grove property has tax liens on it totaling $13,926.07.   [Trustee's Ex. No. 2].

Moreover, the Debtor amended his Statement of Financial Affairs to disclose, in his answer to item number 18, that he has a 5% interest in the MIG Pship; and he also amended his answer to delete any reference to any ownership interest in "Master Investment Group (d/b/a)." [Doc. No. 66, p. 30 of 33]. These amendments directly contradicted the Debtor's representations in his original schedules that he owned the Elderberry Property and that it was his homestead and that he held no interests in any partnerships. [*See* Finding of Fact No. 28].

34.     On February 8, 2016, in case number 15-36276 (initiated by the filing of the Liao *dba*MIG Petition), a second amended Chapter 11 petition was filed. [Case No. 15-36276, Doc. No. 71]. This second amended petition names the debtor as the MIG Pship and, unlike the first amended petition, includes a federal employer identification number—i.e., EIN No. 76-0257712. [Finding of Fact No. 31 in the FOF & COL]. In addition, Michael J. Durrschmidt ("Durrschmidt"), as opposed to McClure, signed as attorney for the MIG Pship on the second amended petition. [*Id.*]. Durrschmidt thus replaced McClure as counsel of record in case number 15-36276, and thereafter capably and forthrightly represented the MIG Pship in hearings before this Court. [Case No. 15-36276, Doc. Nos. 86 & 112]. Further, the Debtor signed this second amended petition as the "General Partner"—as opposed to the "Owner" (which is the capacity in which he signed on the first amended petition). [Finding of Fact No. 31 in the FOF & COL]. Thus, this second amended petition represents—even more accurately than the first amended petition—a filing by a bona fide partnership with a legitimate federal employer identification number, not by an individual's d/b/a. [*Id.*].

14

35.   On February 29, 2016 and March 4, 2016, this Court held a hearing on SOCA's motions to convert, and based upon the record, converted both cases to Chapter 7.  [Finding of Fact No. 35 in the FOF & COL].  As a result of this conversion, the Trustee assumed her duties to administer the Debtor's Chapter 7 estate.

36.   On March 8, 2016, SOCA filed its Objection to Claimed Exemptions ("SOCA's Objection").  [Doc. No. 99].

37.   On March 29, 2016, the Debtor filed his response in opposition to SOCA's Objection. [Doc. No. 118].

38.   On June 8, 2016, this Court held a hearing on SOCA's Objection.  The Court heard testimony from the Debtor and oral arguments of counsel, and continued the hearing until June 27, 2016.

39.   On June 13, 2016, the Trustee filed her Objection to Debtor's Homestead Exemption (the "Trustee's Objection").  [Doc. No. 141].

40.   On June 22, 2016, the Debtor filed his response in opposition to the Trustee's Objection. [Doc. No. 145].

41.   On June 27, 2016, this Court held a simultaneous hearing on both the continued hearing on SOCA's Objection and the initial hearing on the Trustee's Objection.  At the close of the hearing, this Court took SOCA's Objection and the Trustee's Objection under advisement.

### III. CREDIBILITY OF WITNESS

At the hearing on SOCA's Objection and the Trustee's Objection, only one witness testified: the Debtor.  The Debtor did not come to his hearing, however, with a clean slate concerning his credibility.  In this Court's FOF & COL of April 15, 2016, this Court found that

the Debtor had made material misrepresentations on the petitions that he signed and filed on

November 30, 2015, and on the schedules that he filed on December 11, 2015.  [Doc. No. 126,

pp. 19–24].  The FOF & COL make it eminently clear that the Debtor lied under oath when he

filed the second petition on November 30, 2015 representing that Master Investment Group was

his d/b/a (as opposed to a Texas partnership) and that he further lied under oath that he owned

the Elderberry Property.  As this Court stated:

> In sum, McClure and Liao promulgated a fraud on this Court and all
> creditors and other parties-in-interest by: (1) filing the petition naming
> *dba*MIG [i.e., "Master Investment Group (d/b/a)"] as the debtor and
> using Liao's social security number on this petition when a petition
> naming Liao as the debtor and using the same social security number
> had already been filed earlier in the day; (2) asserting that Liao owned
> the Elderberry Property when, in fact, MIG Pship owned this real
> property; and (3) obtaining the benefit of the automatic stay by their
> improper actions, thereby thwarting the legitimate foreclosure sale on
> the Elderberry Property that the Constable of Fort Bend County, Texas
> was on the verge of holding on December 1, 2015.

[Doc. No. 126, pp. 28–29 of 36] (internal citations omitted).

The Debtor's testimony at the hearing on SOCA's Objection and the Trustee's Objection

did not come within hailing distance of establishing now that he is a completely credible witness.

Through leading questions served up to the Debtor by his counsel, McClure, the Debtor wants

this Court to believe that the representations that he made at the outset of his individual case—

i.e., that he owned the Elderberry Property as of November 30, 2015 and that this property was

his homestead—were simply "mistakes." Set forth below is just one example of this scripted

Q&A:

> McClure:  Mr. Liao, the mistakes that are admitting to are contained in
> Schedule A of Exhibit 1 to everyone's books, so the one that
> you have in front of you I guess is the Trustee's Exhibit 1, the
> second page Schedule A, real property. You see that?

> The Debtor: Yes. Yes.

16

McClure:  Okay. Homestead located at 6 Elderberry, rent house at 3810
Belle Grove Lane. Those are mistakes. Correct?

The Debtor:  Yes.

[Hr'g Tr. 90:6–14, June 8, 2016].

In fact, the Debtor went out of his way when being cross-examined to use the word "mistake" as much as he could.  For example, when SOCA's counsel asked him the following question—"You believe Elderberry was your homestead when you filed this bankruptcy?"—the Debtor responded, "No, like I said, that is a mistake . . . ." [Hr'g Tr. 36:23–25, June 8, 2016].  And, as another example, when the Trustee's counsel was probing about whether the Debtor read his schedules before they were filed on December 11, 2015, the Debtor responded that: "I'm very, very sorry I made a big mistake, I didn't—and I don't have enough time to read them thoroughly and say something." [Hr'g Tr. 43:22–24, June 8, 2016].

Prior representations made by the Debtor's own attorney, McClure, convince this Court that there was absolutely nothing mistaken about what the Debtor did when filling out his initial schedules.  Set forth below is the dialogue that the undersigned judge had with McClure about the Debtor's schedules during the hearing held on January 8, 2016:

The Court:  Okay. Right now, we're going to stop. Ms. McClure, can you
explain to me how it is Mr. Liao has signed under oath in his
Schedules that he owns this property [i.e., the Elderberry
Property]? Let me rephrase: Did you before this document,
this Schedule, was filed, sit down and meet with him and
review these Schedules?

McClure:  Yes, Your Honor, I did.

The Court:  Did you impress upon him that he had to be  -- that he was
signing them under oath?

McClure:  Yes, Your Honor.

17

The Court: Okay. Do you think he understood you?

McClure: Yes, sir. My only problem with communications is that sometimes he speaks too fast and so I'm always having to tell him to slow down so I can understand what he's telling me.

The Court: But you did convey to him that he was signing these under oath.

McClure: Yes, Your Honor.

The Court: You did convey to him the importance of them being accurate.

McClure: Yes, Your Honor.

[Hr'g Tr. 138:18–139:14, Jan. 8, 2016].

Given McClure's representations to this Court about the counseling that she gave to the Debtor when he was filling out his original schedules, his testimony now that he did not have sufficient time to read them—and that therefore his representations that he owned the Elderberry Property and that this property was his homestead were simply "mistakes"—is not credible. The Court therefore gives no weight to this particular testimony.

With respect to the Debtor's testimony on certain other points—particularly testimony about his relationship with the Siblings concerning the MIG Pship—while the Debtor is not a very credible witness, the Court gives some weight to his testimony.

## IV. Conclusions Of Law

### A. Jurisdiction

The Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1334(b). This provision provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Bankruptcy Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for

that district. 28 U.S.C. § 157(a).  In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

The dispute at bar is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) because it concerns the administration of the estate; if the Debtor's homestead exemption is denied, the Belle Grove Property will remain as property of the estate, and the Trustee will liquidate it and use the sale proceeds to pay allowed claims.  Additionally, it is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) because it concerns a dispute over the Debtor's claim of exemption of the Belle Grove Property from the Debtor's Chapter 7 estate.  It is also a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(O) because it affects the liquidation of the assets of the estate in that this Court's ruling on SOCA's Objection and the Trustee's Objection will determine whether the Belle Grove Property will be liquidated for the benefit of creditors or will be kept by the Debtor and shielded from his creditors.  Finally, this contested matter is core pursuant to the general "catch-all" language of 28 U.S.C. § 157(b)(2).  *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under §157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."); *De Montaigu v. Ginther (In re Ginther Trusts)*, Adv. No. 06-3556, 2006 WL 3805670, at *19 (Bankr. S.D. Tex. Dec. 22, 2006) (holding that a matter may constitute a core proceeding under 28 U.S.C. § 157(b)(2) "even though the laundry list of core proceedings under § 157(b)(2) does not specifically name this particular circumstance").  Here, the substantive issue that is involved is the right of the Debtor to amend his Schedule C to claim a different homestead exemption pursuant to 11 U.S.C. § 522(b) and Rule 1009(a).[2]

---

[2] Hereinafter, any reference to "the Code" refers to the United States Bankruptcy Code.  Further, any reference to a section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code.  Finally, any reference

**B.    Venue**

Venue is proper under 28 U.S.C. § 1408(1) because the Debtor resided in the Southern District of Texas for the 180 days prior to the Petition Date.

**C.    Constitutional Authority to Enter a Final Order**

In the wake of the Supreme Court's issuance of *Stern v. Marshall*, 131 S. Ct. 2594 (2011), this Court is required to determine whether it has the constitutional authority to enter a final order in any dispute pending before it.  In *Stern*, which involved a core proceeding brought by the debtor under 28 U.S.C. § 157(b)(2)(C), the Supreme Court held that a bankruptcy court "lacked the constitutional authority to enter a final judgment on a state law counterclaim that is not resolved in the process of ruling on a creditor's proof of claim."  *Id.* at 2620.  The pending dispute before this Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (B) and (O). Because *Stern* is replete with language emphasizing that the ruling is limited to the one specific type of core proceeding involved in that dispute, this Court concludes that the limitation imposed by *Stern* does not prohibit this Court from entering a final order here.  A core proceeding under § 157(b)(2)(A), (B) or (O) is entirely different than a core proceeding under § 157(b)(2)(C).  *See, e.g., Badami v. Sears (In re AFY, Inc.)*, 461 B.R. 541, 547–48 (B.A.P. 8th Cir. 2012) ("Unless and until the Supreme Court visits other provisions of Section 157(b)(2), we take the Supreme Court at its word and hold that the balance of the authority granted to bankruptcy judges by Congress in 28 U.S.C. § 157(b)(2) is constitutional."); *see also In re Davis*, 538 F. App'x 440, 443 (5th Cir. 2013) *cert. denied sub nom. Tanguy v. W.*, 134 S. Ct. 1002 (2014) ("[W]hile it is true that *Stern* invalidated 28 U.S.C. § 157(b)(2)(C) with respect to 'counterclaims by the estate against persons filing claims against the estate,' *Stern* expressly provides that its limited holding applies only in that 'one isolated respect.' . . . We decline to extend *Stern*'s limited holding

to a Rule refers to the Federal Rules of Bankruptcy Procedure.

herein.").

Finally, in the alternative, this Court has the constitutional authority to enter a final order because all of the parties in this matter have consented to adjudication of this dispute by this Court. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent . . . ."). Indeed, the Debtor filed his amended Schedules A and C, [Finding of Fact No. 33]; SOCA filed its objection (previously defined as SOCA's Objection), [Finding of Fact No. 36]; the Debtor filed a response opposing SOCA's Objection, [Finding of Fact No. 37]; the Court held a hearing on SOCA's Objection and then continued this hearing, [Finding of Fact No. 38]; then the Trustee filed the Trustee's Objection, [Finding of Fact No. 39]; the Debtor thereafter filed his response opposing the Trustee's Objection, [Finding of Fact No. 40]; this Court then held a simultaneous hearing on both the continued hearing on SOCA's Objection and the initial hearing on the Trustee's Objection, [Finding of Fact No. 41]; and none of the parties—orally or in writing—ever objected to this Court's constitutional authority to enter a final order on either SOCA's Objection or the Trustee's Objection. Finally, at the hearing held on June 27, 2016, this Court expressly asked counsel for all of the parties if they consented to this Court entering a final order, and all three responded that they did consent. If these circumstances do not constitute consent, nothing does.

**D.    Has the Belle Grove Property Ever Been the Debtor's Homestead and, Even if it has, did the Debtor Abandon This Property as his Homestead?**

In a bankruptcy case, a debtor may use the federal homestead exemption or elect to use the homestead exemption of his state of domicile.  11 U.S.C. § 522(b).  In the case at bar, the

Debtor has elected to have his homestead exemption determined by Texas state law. [Finding of Fact No. 33].

Both SOCA and the Trustee have objected to the Debtor's claimed exemption of the Belle Grove Property on the grounds, among others, that the Debtor abandoned his homestead interest in this property. [Doc. No. 99, p. 3 ¶12]; [Doc. No. 141, p. 8 ¶17]. Before addressing the abandonment issue, this Court must first examine whether the Debtor ever had a homestead interest in the Belle Grove Property. *See Hillock Homes, Inc. v. Claflin (In re Claflin)*, 761 F.2d 1088, 1092 (5th Cir. 1985) (referring to *Burk Royalty Co. v. Riley*, 475 S.W.2d 566, 568 (Tex. 1972) and holding that "it is presumed that a homestead continues absent proof of abandonment only if the existence of the homestead is first proved").

    1.    <u>The Debtor Maintained a Homestead Interest in the Belle Grove Property From August 1988 to September 2012.</u>

The purpose of the Texas homestead exemption laws is to protect the ownership of a home. *See In re Evans*, 135 B.R. 261, 264 (Bankr. S.D. Tex. 1991); *see also* Tex. Const. art. 16, § 50. But mere ownership is not in and of itself sufficient to establish a homestead. *In re Saldana*, 531 B.R. 141, 156 (Bankr. N.D. Tex. 2015). Rather, a claimant must show "both (i) overt acts of homestead usage and (ii) the intention on [his/her] part . . . to claim the land as a homestead." *Id.* (internal citation omitted). As to the first prong, using the property as a residence will be sufficient to establish the property "for homestead purposes." *See Kennard v. MBank Waco, N.A. (In re Kennard)*, 970 F.2d 1455, 1458 (5th Cir. 1992). As to the second prong, actual use of the property is also "the most satisfactory and convincing evidence of intention." *Id.* at 1459.

In the dispute at bar, the Debtor had been living at the Belle Grove Property since August 1988, until he moved into the Elderberry Property in September 2012. [Findings of Fact Nos. 2,

3 & 12]. When the Debtor obtained a divorce in 2002, he purchased his ex-wife's interest in the Belle Grove Property. [Finding of Fact No. 2]. The deed to the Belle Grove Property has always been in the Debtor's name. *Id.* In addition, the Debtor has always maintained the utilities of the Belle Grove Property in his name, except when he rented out the property from July 15, 2013 to June 30, 2014. [Finding of Fact No. 3]. Therefore, at least until September 2012, the Debtor not only had an ownership interest in the Belle Grove Property, but also had a possessory interest and actually resided there for homestead purposes. [*See* Findings of Fact Nos. 2, 3 & 12]. Such facts demonstrate that the Debtor maintained a homestead interest in the Belle Grove Property from August 1988 to September 2012. Thus, the key question now is whether the Debtor abandoned the Belle Grove Property as his homestead.

2.   The Debtor Did Not Abandon His Homestead Interest in the Belle Grove Property.

Homestead exemption in a bankruptcy case is determined as of the date of the original bankruptcy petition rather than as of the date of conversion. *Lowe v. Sandoval (In re Sandoval)*, 103 F.3d 20, 23 (5th Cir. 1997). "In doing so, [the Fifth Circuit] join[s] the ranks of a number of courts holding that the right to exemptions is determined by facts as they existed on the date of the original bankruptcy petition." *Id.* (internal citations omitted).

The Trustee contends that by having moved into the Elderberry Property in 2012 and having designated the Elderberry Property as his homestead in his original schedules, the Debtor, as of the Petition Date, intended to establish a new homestead and therefore abandoned his homestead interest in the Belle Grove Property. [Hr'g Tr. 151:16–152:17, June 8, 2016]. Thus, the issue at bar is, given that the Debtor has established that he had a homestead interest in the Belle Grove Property, whether he abandoned such interest at some point prior to or on the

Petition Date and therefore is not now entitled to claim his homestead exemption on the Belle Grove Property.

Abandonment of homestead is a question of fact on which both use and intent are relevant. *Hollifield v. Hilton*, 515 S.W.2d 717, 721 (Tex. App.—Fort Worth 1974, writ ref'd n.r.e.) (internal citation omitted); *see In re Perry*, 345 F.3d 303, 319 (5th Cir. 2003) (internal citation omitted).    Specifically, abandonment requires: (i) a claimant's cessation or discontinuance of the use of the property, and (ii) his intent to abandon permanently the homestead. *Perry*, 345 F.3d at 310 n.8 (internal citation omitted).  For the reasons set forth below, this Court finds that the Debtor, as of the Petition Date, had not abandoned his homestead interest in the Belle Grove Property.

a. *The Debtor did not abandon his homestead interest in the Belle Grove Property by moving into the Elderberry Property.*

Under Texas law, a homestead exemption "claimant may only have one homestead at any given time." *Thaw v. Schachar (In re Thaw)*, 620 F. App'x 304, 309 (5th Cir. 2015) (internal citations omitted).   Accordingly, acquisition of a new homestead automatically results in the abandonment of the old homestead as a matter of law. *Claflin*, 761 F.2d at 1092 n.3; *see also Coury v. Prot*, 85 F.3d 244, 254 (5th Cir. 1996).

The Debtor's move into the Elderberry Property in September of 2012 did not constitute abandonment of the Belle Grove Property.  As of the Petition Date, the deed to the Elderberry Property was titled in the name of the MIG Pship rather than the Debtor himself. [*See* Finding of Fact No. 21].  Therefore, the fundamental element for the Debtor to claim the Elderberry Property as his homestead—the actual ownership of the property—is lacking here. *See Evans*, 135 B.R. at 264 (stating that the purpose of the Texas homestead exemption laws is to protect the ownership of a home).  Because the Debtor had conveyed the Elderberry Property to the MIG

24

Pship six months before the Petition Date—in May of 2015, [Finding of Fact No. 21]—the Debtor lacked ownership of the Elderberry Property on the Petition Date. Thus, the Debtor did not acquire a new homestead and therefore did not abandon the Belle Grove Property.

Alternatively, even though at two different times before the Petition Date—on August 12, 2012 and March 13, 2013—the deed to the Elderberry Property was put in the Debtor's name, [Finding of Fact No. 10, 14 & 15], the Debtor never had the intent to claim it as his homestead. In fact, he moved into the Elderberry Property because the Siblings asked him to maintain this property, which the Debtor and the Siblings considered as investment property owned by the MIG Pship. [Finding of Fact No. 12]. Therefore, the Debtor did not abandon his homestead interest in the Belle Grove Property by moving into the Elderberry Property.

> b. *Nor did the Debtor abandon his homestead interest in the Belle Grove Property by renting it out.*

As mentioned above, abandonment requires: (i) a claimant's cessation or discontinuance of the use of the property, and (ii) his intent to permanently abandon the homestead. *Perry*, 345 F.3d at 310 n.8. When a court applies the *Perry* abandonment test to determine whether a rented-out homestead is abandoned and, therefore, loses its homestead character, the dispositive factor is the owner's intent to resume control of the property. *See In re Crump*, 533 B.R. 567, 573 (Bankr. N.D. Tex. 2015); *In re McDonald*, 486 B.R. 843, 845 (Bankr. S.D. Tex. 2013) ("[M]ere removal from premises occupied as a homestead . . . does not constitute an abandonment so long as no other homestead is acquired and there remains at all times an intention to return and again occupy the property as the family residence.") (internal quotations and citations omitted). As to a rented-out property, the Texas Constitution and Texas Property Code protect its homestead status if it is only temporarily leased. *Perry*, 345 F.3d at 319. On the

other hand, a permanent lease of the property may be sufficient to constitute an abandonment. *Id.*

Whether a lease is temporary or permanent is a factual inquiry. In *Crump*, the Bankruptcy Court for the Northern District of Texas applied the *Perry* test to examine whether the debtors abandoned their homestead by entering into two lease agreements. 533 B.R. at 572–75. Under the two leases, the debtors rented out different portions of their homestead. *Id.* The first lease was a five-year lease under which either party could terminate the lease at the end of any year with timely notice. *Id.* at 573. In addition, the debtors controlled the way the leased property was to be used by the lessee and did not alter the nature of the property or add any structures to the property. *Id.* at 573–74. The court therefore concluded that such facts demonstrated the debtors' intention to resume possession and control of that part of the tract under the first lease. *Id.* at 574. In contrast, the second lease was a lengthy thirty-year lease, which gave only the lessee a unilateral right to surrender the leased property. *Id.* Also, the nature of the leased portions of the tract was changed to accommodate the business of the lessee. *Id.* Based upon these particular facts, the court concluded that, unlike the first lease, the second lease failed to support a finding that the debtors intended to resume control of the leased portions. *Id.* Therefore, the property rented under the second lease lost its homestead character and was considered abandoned by the debtors. *Id.* at 575.

In the dispute at bar, the Debtor, in the capacity as the landlord, rented out the Belle Grove Property under two different leases effective on July 15, 2013 and November 1, 2015, respectively. [Finding of Fact No. 3]. The first lease had a term of less than one year, while the second lease was a two-year lease, under both of which the landlord (i.e., the Debtor) had the right to prevent the leases from being automatically renewed by giving the tenants written notice

of termination. [*Id.*]. Moreover, under both leases, the tenants could only use the property as a private residence. [*Id.*]. Under these particular circumstances, this Court finds that these two leases are more similar to the first lease in *Crump* and therefore do not negate the Debtor's intent to resume control of the Belle Grove Property. Also, except during the duration of the first lease, the Debtor has always maintained the utilities of the Belle Grove Property under his own name, [*Id.*], which demonstrates his intent to resume control of the property. Thus, these facts support a finding that the Debtor, as of the Petition Date, had not abandoned the Belle Grove Property simply by renting it out under the two relatively short-term leases that were for private residence purposes only.

**E.      Even if the Debtor Did Not Abandon His Homestead Interest in the Belle Grove Property, Does His Bad-Faith Conduct in the Case at Bar Estop Him From Claiming the Belle Grove Property as his Homestead?**

SOCA asserts that judicial estoppel bars the Debtor from amending the homestead exemption that he designated in his original schedules (i.e., the Elderberry Property). [*See* Doc. No. 99, p. 3 ¶12]. Rule 1009(a) states that "a . . . schedule . . . may be amended by the debtor as a matter of course at any time before the case is closed." Fed. R. Bankr. P. 1009(a). In *Sandavol*, the Fifth Circuit interpreted Rule 1009(a) as prohibiting courts from denying a debtor's amendment, unless a creditor demonstrates the debtor's bad faith or prejudice to creditors. 103 F.3d at 22. The Fifth Circuit adopted this approach from the Eleventh Circuit's ruling in *In re Doan*, 672 F.2d 831 (11th Cir. 1982), where the Eleventh Circuit held that a court may deny leave to amend if there is a showing of the debtor's bad faith or prejudice to the creditors. *Id.* at 833–34.

However, in *Siegel*, the Supreme Court implicitly overruled *Doan* and other related cases that endorse a general, equitable power in bankruptcy courts to deny exemptions based on a

debtor's bad-faith conduct. 134 S. Ct. at 1196. In *Siegel*, the Supreme Court considered whether a bankruptcy court may, under § 105(a) of the Code, order that a debtor's exempt assets be used to pay administrative expenses incurred as a result of the debtor's misconduct. *Id.* at 1192. There, the trustee sought to surcharge the debtor's $75,000.00 homestead exemption with the costs that he had expended in avoiding a fraudulent lien on the debtor's homestead. *Id.* at 1193. The Supreme Court concluded that the bankruptcy court exceeded its inherent powers and violated § 522(k) of the Code by ordering the surcharge. *Id.* at 1195.

Although the holding in *Siegel* appears to be applicable only to equitably surcharging an exemption claimed under § 522, the Supreme Court in *Siegel* went on to state that the Code does not confer "a general equitable power in bankruptcy courts to deny exemptions based on a debtor's bad-faith conduct." *Id.* at 1196. Rather, the Code's "meticulous . . . enumeration of exemptions and exceptions to those exemptions confirms that courts are not authorized to create additional exceptions." *Id.* (internal citations omitted). In other words, the *Siegel* decision "prohibits [a] bankruptcy court from disallowing the debtors' claimed exemptions because of their alleged bad faith and fraudulent conduct." *Baker v. Baker (In re Baker)*, 791 F.3d 677, 682 (6th Cir. 2015).[3] Thus, contrary to the arguments of the Trustee and SOCA, this Court may not use its equitable powers under § 105(a)—or, for that matter, its inherent powers to police the conduct of the litigants in its court, *see Chambers v. Nasco*, 501 U.S. 32 (1991)—to bar the Debtor from claiming the Belle Grove Property as his homestead. Stated differently, there is no

---

[3] This Court notes that in one case, a bankruptcy court denied a bad-faith debtor's amendment of exemptions and, by reading the *Siegel* decision very narrowly, did not follow the Supreme Court's dictum in this case. *See In re Woolner*, No. 13-57269-wsd, 2014 WL 7184042, at *3–4 (Bankr. E.D. Mich. Dec. 15, 2014). But since then, "no other court has followed the rationale of [*Woolner*], and indeed even the court that decided that case is constrained against applying it by the Sixth Circuit's subsequent binding precedent." *Taylor v. Caillaud*, No. 3:15-CV-00206, 2015 WL 7738391, at *5 (W.D.N.C. Dec. 1, 2015) (referring to *Baker*, 791 F.3d at 677); *see, e.g., In re Coyle*, No. 14-90026, 2016 WL 828459, at *3 n.2 (Bankr. C.D. Ill. Mar. 2, 2016) ("This Court does not find the reasoning of *Woolner* to be persuasive in any respect."); *In re Whittick*, 547 B.R. 628, 639 (Bankr. D.N.J. 2016) ("However, those decisions were expressly overruled by the Supreme Court in *Law v. Siegel*.") (internal citations omitted).

equitable power *under federal law* to stop the Debtor, however unsavory his conduct has been, from exempting the Belle Grove Property.

Nonetheless, the Supreme Court did leave open the possibility that "when a debtor claims a *state-created* exemption, the exemption's scope is determined by state law, which may provide that certain types of debtor misconduct warrant denial of the exemption." *Siegel*, 134 S. Ct. at 1196–97 (emphasis in original) (internal citations omitted); *Whittick*, 547 B.R. at 639 ("The Supreme Court allows that exemptions taken under state law might include bases for denial including misconduct . . . ."). In the dispute at bar, the Debtor asserts his homestead exemption under Texas law, [Finding of Fact No. 33]; the Trustee has expressly raised her objection under Texas law in the Trustee's Objection, [Doc. No. 141, pp. 5–12]; and SOCA seems to do so in SOCA's Objection, [Doc. No. 99, p. 3 of 5].[4]  Under Rule 4003(c), "the objecting party has the burden of proving that the exemptions are not properly claimed." Fed. R. Bankr. P. 4003(c). Thus, the question for this Court to answer is whether SOCA and the Trustee have met their burden of proof under Texas law in challenging the Debtor's proposed amendment of his homestead. In SOCA's Objection and the Trustee's Objection, and at the two hearings held on June 8 and June 27, 2016, SOCA and the Trustee raised two separate and independent legal doctrines under Texas law as grounds for barring the Debtor from claiming the Belle Grove Property as his homestead: (1) judicial estoppel, and (2) quasi-estoppel. Set forth below is this Court's analysis of these arguments.

---

[4] SOCA's Objection, unlike the Trustee's Objection, does not expressly refer to estoppel under Texas law, but rather asserts that "[t]he doctrine of estoppel bars the Debtor from claiming 3810 Belle Grove as his homestead." [Doc. No. 99, p. 3 of 5].  Nevertheless, given this statement in the pleading, and the dialogue that this Court had with SOCA's counsel at the June 27, 2016 hearing, the Court construes SOCA's Objection to be based upon estoppel under Texas law.

**F.      Under Texas Law, Does Either the Doctrine of Judicial Estoppel or the Doctrine of Quasi-Estoppel Bar the Debtor From Claiming the Belle Grove Property as His Homestead?**

Homesteads have been recognized as "favorites of [Texas] law" and "[a court] must give liberal construction to the constitutional and statutory provisions that protect homestead exemptions." *Bradley v. Pac. Sw. Bank, FSB (In re Bradley)*, 960 F.2d 502, 507 (5th Cir. 1992). However, Texas courts have also sought to "balance the importance of constitutional homestead protection with 'policy considerations which abhor the perpetration of fraud on creditors.' " *Thomas v. Graham Mortg. Corp.*, 408 S.W.3d 581, 589 (Tex. App.—Austin 2013, pet. denied) (quoting *First Interstate Bank of Bedford v. Bland*, 810 S.W.2d 277, 283 (Tex. App.—Fort Worth 1991, no writ)).

As mentioned above, *Siegel* left open the possibility that state law may provide an avenue for courts to deny homestead exemptions based upon certain types of debtor misconduct. In fact, courts have invoked estoppel doctrines under Texas law to deny homestead exemptions. *See, e.g.*, *id.* at 589–92 (affirming a summary judgment in favor of the creditor over the debtor's claimed homestead exemption on the grounds of estoppel); *Alexander v. Wilson*, 77 S.W.2d 873, 874 (Comm'n App. 1935) (affirming a verdict for the lenders over the borrowers' claimed homestead exemption on the grounds of estoppel). Thus, the scope of homestead exemption under Texas state law is subject to and can be limited by state law estoppel doctrines. *Cf. In re Lua*, 529 B.R. 766, 775–79 (Bankr. C.D. Cal. 2015) (applying judicial estoppel and equitable estoppel doctrines under California state law to disallow an amendment of state-created homestead exemption).[5]

---

[5] This Court recognizes that there is another line of federal case law holding that federal estoppel doctrines rather than state doctrines should apply to a federal cause of action before a federal court, including a bankruptcy court. *See Eastman, Eastman v. Union Pac. R.R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007) ("We similarly believe Gardner's pendent state law claims arising under Wyoming law must be analyzed in the context of federal

Here, both SOCA and the Trustee timely raised their objections to the Debtor's proposed amendment of his homestead under Texas state law. [Findings of Fact Nos. 36 & 39].[6] Also, the dispute at bar is distinguished from *Siegel*, where the debtor's claim of exemption was not directly contested or challenged by other parties—the issue there was whether the bankruptcy court had authority to "surcharge" an already allowed exemption based upon the debtor's bad acts. 134 S. Ct. at 1196; *see also Osborn v. Durant Bank & Tr. Co. (In re Osborn)*, 24 F.3d 1199, 1206 (10th Cir. 1994) (quoting *Redmond v. Tuttle*, 698 F.2d 414, 417 (10th Cir. 1983)) (noting that " '[w]hether the claims of exemption contained in [an] amendment will be approved if an interested party *timely objects* . . . is a separate issue' " and applying the estoppel doctrine under Texas law to examine the debtors' proposed amendment of homestead in their bankruptcy schedules) (abrogated in part by *Eastman*, 493 F.3d at 1151) (emphasis added).[7]

Considering such distinction, this Court is obliged to balance the Debtor's homestead interest against the interests of SOCA and the Trustee. Indeed, there is case law applying the estoppel doctrine under Texas law to examine the debtors' proposed amendment of homestead in their bankruptcy schedules. *See Osborn*, 24 F.3d at 1206–09. For the reasons set forth below, this Court concludes that although the requirements for judicial estoppel under Texas law are not entirely met in the dispute at bar, the requirements for quasi-estoppel are all satisfied. Therefore,

---

principles. The doctrine of federal judicial estoppel is foremost designed to protect the federal judicial process . . . . [A] federal court's ability to protect itself from manipulation should not depend upon the law of the state under which some or all of the claims arise."); *In re Horizon Womens Care Prof'l LLC*, Case No. 13-28436 HRT, Adv. No. 14-01074, 2015 WL 2147970, at *7 (Bankr. D. Colo. Apr. 17, 2015) (applying federal judicial estoppel principles in a bankruptcy adversary proceeding, concluding that "[b]ankruptcy is, of course, solely a federal court matter" and "[t]he interests and processes sought to be protected . . . are federal court interests"). The undersigned bankruptcy judge does not find these cases persuasive, and concludes that the state-law estoppel doctrines can apply when a debtor is claiming an exemption under state law.

[6] *See supra* note 4.

[7] *See supra* note 5.

31

the Debtor is barred from amending his Schedule C to claim the Belle Grove Property as his homestead.

      1.     <u>The Requirements for Judicial Estoppel Under Texas Law Are Not Entirely Met.</u>

The doctrine of judicial estoppel under Texas law "precludes a party from adopting a position inconsistent with one that it maintained successfully in an earlier proceeding." *Pleasant Glade Assembly of God v. Schubert*, 264 S.W.3d 1, 6 (Tex. 2008) (internal citation omitted). The essential function of judicial estoppel "is to prevent the use of intentional self-contradiction as a means of obtaining unfair advantage." *Andrews v. Diamond, Rash, Leslie & Smith*, 959 S.W.2d 646, 650 (Tex. App.—El Paso 1997, writ denied). The elements of judicial estoppel are: (1) a sworn, prior inconsistent statement made in a judicial proceeding; (2) which was successfully maintained in the prior proceeding; (3) not made inadvertently or by mistake, or pursuant to fraud or duress; and (4) which is deliberate, clear, and unequivocal. *Id.* at n.2 (internal citations omitted).

As to the first element, the doctrine is most commonly applied to sworn statements of parties in prior judicial proceedings, but it also applies to statements of attorneys explaining their client's position in those proceedings. *Forbush v. J.C. Penny Co., Inc.*, 1997 U.S. App. LEXIS 41657, at *17 (5th Cir. 1997) ("[B]ecause Texas courts have clearly held that even though attorney's statements are not evidence, they establish a client's legal position."); *Sedgewick v. Kirby Lumber Co.*, 107 S.W.2d 358, 359–60 (Tex. 1937) (counsel's statement in open court used by court to interpret the litigant's stance in petition); *Webb v. City of Dallas*, 211 S.W.3d 808, 820 (Tex. App.—Dallas 2006, pet. denied); *Goldman v. White Rose Distributing Co.*, 936 S.W.2d 393, 398 (Tex. App.—Fort Worth 1996), *vacated pursuant to settlement*, 949 S.W.2d 707 (Tex. 1997). In the dispute at bar, the Debtor filed his original schedules and represented

under oath that the Belle Grove Property was a "Rent house" and that the Elderberry Property was his "Homestead." [Finding of Fact No. 28]. Further, the Debtor's counsel (McClure) filed a pleading on December 1, 2015 expressly representing that the Elderberry Property is the Debtor's homestead. [Finding of Fact No. 27]. Finally, at the hearing held on December 15, 2015, McClure represented three times to this Court that the Elderberry Property was the Debtor's homestead. [Finding of Fact No. 29]. Given that the Debtor is now claiming the Belle Grove Property as his homestead, there is clearly a "sworn, prior inconsistent statement made in a judicial proceeding." Therefore, the first element of judicial estoppel is satisfied.

In addition, this Court finds that the Debtor made a "deliberate, clear, and unequivocal" statement when he claimed the Elderberry Property as his homestead. In *Osborn*, the debtors, husband and wife, elected the state exemption scheme and filed their original schedules listing two pieces of property: (1) Texas property described as "10818 Lake June Road, Dallas, Texas" and valued at $70,000.00, and (2) Oklahoma property valued at $238,950.00. *Osborn*, 24 F.3d at 1201, 1206. The debtors listed as exempt a "Homestead," followed by a citation to "31 Okl St. Ann § 31 et sq.," and stated the property was valued at $70,000.00, without specifying the location of that homestead. *Id.* at 1201. The debtors later sought to amend their schedules to claim the Texas property as their exempt homestead. *Id.* at 1202. The bankruptcy court denied the amendment and its decision was affirmed by the district court. *Id.* However, the Tenth Circuit—applying Texas law—held that the rejection of the debtors' homestead claim was in error because the facts in that case failed to show a "deliberate misrepresentation that satisfie[d] the strict Texas requirements [for estoppel]." *Id.* at 1208–09. The Tenth Circuit particularly emphasized that the value of the Texas property, as indicated in the debtors' schedules, was the same as the value of the homestead, which therefore "seem[ed] to link the [Texas] real property

33

to the homestead claim." *Id.* at 1208. According to the Tenth Circuit, the one reference in the debtors' schedules to the Oklahoma homestead exemption statute—as opposed to the applicable Texas homestead exemption statute—did not rise to the level of "deliberate misrepresentation." *Id.* Therefore, the Tenth Circuit concluded that the facts in that case were insufficient to remove the "hypothesis of mere mistake" and to constitute "deliberate misrepresentation" under Texas law. *Id.*

The dispute at bar, however, can be distinguished from *Osborn*. Unlike the ambiguous disclosure made by the debtors in *Osborn*, here, the Elderberry Property was expressly and unequivocally claimed by the Debtor as his "Homestead" in his original schedules. Moreover, he represented in the original schedules that the Belle Grove Property was a "Rent house." [Finding of Fact No. 28]. Further, the Debtor's counsel represented in a pleading that she filed on December 1, 2015 that the Elderberry Property was the Debtor's homestead. [Finding of Fact No. 27]. And, at the hearing held on December 15, 2015, his attorney also expressly represented three times to this Court that the Elderberry Property was the Debtor's homestead. [Finding of Fact No. 29]. Indeed, the Debtor made these representations in an attempt to improperly exempt the Elderberry Property, [*Id.*]; and he did not seek to amend his homestead exemption until SOCA filed its motions to convert to Chapter 7 both of the cases that the Debtor had initiated on November 30, 2015, [Finding of Fact No. 32]. Clearly, there was a "deliberate, clear, and unequivocal" statement made by the Debtor that was contrary to the essential fact: he did not own the Elderberry Property on the Petition Date; the MIG Pship owned it. And, the facts do not show that the statements of the Debtor or his attorney were made either inadvertently or by mistake, or pursuant to fraud or duress. Just the contrary: they were deliberately made. Under these circumstances, the third and fourth elements of judicial estoppel are satisfied.

Nonetheless, this Court finds that the second element of the judicial estoppel standard is lacking here because the Debtor's position that the Elderberry Property was his homestead has not been "successfully maintained in the prior proceeding." First, there is no "prior proceeding" in the dispute at bar. The judicial estoppel doctrine applies only in a "subsequent action or proceeding, and does not apply to a contrary position taken with the same proceeding." *New AAA Apartment Plumbers, Inc. v. DPMC-Briarcliff, L.P.*, No. 14-05-00485-CV, 2006 WL 2827275, at \*6 (Tex. App.—Houston [14th Dist.] Oct. 5, 2006, no pet.) (mem. op.). The contrary positions taken by the Debtor as to his homestead are actually in the same proceeding that is before this Court. *See id.* (holding that an appeal from a case remanded by another court of appeals was part of the same proceeding that was before that court of appeals). As there is no "prior proceeding," there necessarily cannot have been a position that was to be "successfully maintained."

In sum, contrary to the positions of SOCA and the Trustee, the Debtor is not judicially estopped from amending his Schedule C to claim the Belle Grove Property as his homestead.

2.      The requirements for quasi-estoppel under Texas law are entirely satisfied.

Under Texas law, quasi-estoppel "forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects." *Davidson v. Davidson*, 947 F.2d 1294, 1297 (5th Cir. 1991) (internal citations omitted). "The doctrine applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 864 (Tex. 2000). The elements of quasi-estoppel are: (1) the Debtor acquiesced to or benefited from a position inconsistent with his present position; (2) it would be unconscionable to allow the

35

Debtor to maintain his present position; and (3) the Debtor had knowledge of all material facts at the time of the conduct on which estoppel is based. *Bank of Am., N.A. v. Prize Energy Resources, L.P.*, No. 04-13-00201-CV, 2014 WL 4257865, at \*11 (Tex. App.—San Antonio, Aug. 29, 2014), *judgm't vacated by agrm't*, 2015 WL 1138309. (internal citations omitted); *see also Hartford Fire Ins. Co. v. City of Mont Belvieu*, 611 F.3d 289, 298 (5th Cir. 2010).

In the dispute at bar, by claiming in his original schedules that, as of the Petition Date, he owned the Elderberry Property and that it was his homestead, the Debtor clearly held a position inconsistent with his current position that he does not own the Elderberry Property and that the Belle Grove Property is his homestead. Moreover, at the time of the conduct on which estoppel is based—i.e., November 30, 2015 and December 11, 2015[8]—the Debtor knew that he, in fact, did not own the Elderberry Property. [Finding of Fact No. 25]. Thus, the key question is whether the Debtor benefited from his prior position that he owned the Elderberry Property and that it was his homestead. Based upon case law applying the doctrine of quasi-estoppel under Texas law, this Court concludes that he did, in fact, benefit from initially claiming this position.

In *Davidson*, the debtor had taken tax deductions for the payments made to his ex-wife for three years by treating the payments as alimony. 947 F.2d at 1297. Later, the debtor stopped paying alimony; and after his ex-wife won a summary judgment to enforce the terms of their divorce, the debtor filed a Chapter 7 petition. *Id.* at 1296. The bankruptcy court held an adversary proceeding to determine whether the monthly payment obligations of the debtor to his ex-wife were dischargeable obligations; the debtor asserted that they were; and his ex-wife

---

[8] November 30, 2015 is the date the Debtor filed the two petitions, including the Liao *dba*MIG Petition, [Findings of Fact Nos. 23 & 25]; and December 11, 2015 is the date the Debtor filed his initial schedules representing that as of the Petition Date, he personally owned the Elderberry Property and that this property was his homestead, [Finding of Fact No. 28].

36

asserted that they were not. *In re Davidson*, 104 B.R. 788 (Bankr. N.D. Tex. 1989), *rev'd*, 947 F.2d at 1298.

The bankruptcy court determined that the parties had intended the periodic payments to be in the nature of a property settlement, rather than alimony, and therefore held that all the periodic payment debts were dischargeable in bankruptcy. *Davidson*, 947 F.2d at 1296. The district court affirmed the bankruptcy court's ruling. *Id.* However, the Fifth Circuit reversed the district court's ruling and held that the debtor was estopped from claiming that his payment obligations to the ex-wife were not in the nature of alimony in his subsequent bankruptcy case. *Id.* at 1297. Specifically, the debtor had accepted the benefits by taking tax deductions for the payments made to the ex-wife. *Id.* The Fifth Circuit bluntly stated that, "[t]o uphold the discharge of those payments . . . would reward an admitted manipulation tantamount, at best, to deception." *Id.*

Similarly, the Debtor in the dispute at bar benefited from his prior position. Before the Petition Date, the Debtor was notified that the Constable of Fort Bend County would hold a foreclosure sale of the Elderberry Property on December 1, 2015. [Finding of Fact No. 22]. In order to stop the foreclosure sale on the Elderberry Property, the Debtor filed the Liao Petition in his own name on the Petition Date—just one day before the scheduled foreclosure sale of the Elderberry Property. [Finding of Fact No. 23]. Once the Liao Petition was filed, the Debtor's counsel, McClure, provided a copy of this petition to the Deputy Constable in charge of conducting the foreclosure sale. [Finding of Fact No. 24]. McClure informed him that the Debtor owned the Elderberry Property and that he could not go forward with the foreclosure sale due to the imposition of the automatic stay. [*Id.*]. After the Deputy Constable informed the Debtor's counsel that the Debtor's personal bankruptcy did not automatically stay the foreclosure

sale because the Elderberry Property was owned by an entity known as "Master Investment Group," and not Howard Liao (i.e., the Debtor), the Debtor's counsel immediately prepared the Liao *dba*MIG Petition. [Finding of Fact No. 25]. This petition—which was a second petition filed by the Debtor, in his individual capacity, falsely representing that he owned a d/b/a named "Master Investment Group"—was expressly filed to stop the foreclosure. [Finding of Fact No. 26]. And, in fact, it was successful in doing so. [*Id.*]. Indeed, after seeing the name of "Master Investment Group" on the second petition provided to him by the Debtor's counsel, the Deputy Constable—not wanting to violate the automatic stay—decided to cancel the scheduled foreclosure sale. [*Id.*].

At the time the Debtor signed the Liao *dba*MIG Petition, he knew that the entity known as "Master Investment Group" was not his d/b/a, but rather was—and still is—a Texas partnership in which he and the Siblings are the partners. [Finding of Fact No. 25]. And, at the time he signed this petition, the Debtor also knew that the partnership—and not he, individually—owned the Elderberry Property. [*Id.*]. Thus, the Debtor made a false oath in order to stop the scheduled foreclosure sale on the Elderberry Property. In doing so, he obtained a benefit to SOCA's detriment. Specifically, by filing the Liao *dba*MIG Petition to stop the foreclosure sale that SOCA sought—a sale that would have paid down a debt held by SOCA— the Debtor ensured that the MIG Pship kept title to the Elderberry Property, which meant that he preserved the value of the ownership interests in the MIG Pship held by the Siblings and himself. This is no mean point, as there is substantial equity in the Elderberry Property—approximately $660,000.00. [Finding of Fact No. 11].[9]

---

[9] Indeed, according to the schedules filed on February 8, 2016 that the Debtor signed in his capacity as the general partner of the MIG Pship, this partnership is very solvent. Its estate has total assets of $3,674,165.00 and total liabilities of $869,978.07, indicating total equity of $2,804,186.93. [Case No. 15-36276, Doc. No. 73].

Then, twelve days after he filed the two Chapter 11 petitions in his name on November 30, 2015, the Debtor filed his schedules and, on Schedule A, represented that as of the Petition Date, he personally owned the Elderberry Property and the Belle Grove Property, [Finding of Fact No. 28]; and, on Schedule C, represented that as of the Petition Date, the Elderberry Property was his homestead, [*Id.*]. Once again, the Debtor gave a false oath because he knew at this time that the MIG Pship, not he, held title to the Elderberry Property as of the Petition Date. [Finding of Fact No. 25]. Moreover, in both the pleading that the Debtor's counsel (McClure) filed on December 1, 2015, and at the first hearing held in this case on December 15, 2015, the Debtor, through McClure, unequivocally represented to this Court four times that the Elderberry Property was his homestead. [Findings of Fact Nos. 27 & 29]. Thus, she led this Court to believe that as of the Petition Date, the Debtor himself owned the Elderberry Property and that the foreclosure sale scheduled for December 1, 2015 was legitimately stopped by the imposition of the automatic stay. These statements are unquestionably imputed to the Debtor, *Sedgewick*, 107 S.W.2d at 359–60; *Forbush*, 1997 U.S. App. LEXIS 41657 at *17; *Goldman*, 936 S.W.2d at 398—indeed, he was in the courtroom listening to his attorney make these statements—so not only did the Debtor give a false oath in writing, but he, through his attorney, made statements to this Court that were materially inaccurate.

After this Court held hearings on December 15, 2015 and January 8, 2016, and discovered the Debtor's deception—that he was improperly exempting the Elderberry Property by claiming that he owned this property as of the Petition Date—the Debtor concocted a new scheme. Specifically, he decided: (1) to amend his personal schedules to delete any representation that, as of the Petition Date, he owned the Elderberry Property or that this property was his homestead; (2) to amend the Liao *dba*MIG Petition in case number 15-36276 to

set forth that this debtor, as of the Petition Date, was actually a partnership, not a d/b/a, [Finding of Fact No. 30]; (3) to file schedules in case number 15-36276 representing that this entity (i.e., MIG Pship) actually owned the Elderberry Property as of the Petition Date; and (4) in his individual case, to amend his Schedule C to claim the Belle Grove Property as his homestead as of the Petition Date. Thus, despite initially scheduling the Belle Grove Property as a non-exempt asset, and despite his attorney representing to this Court that the Belle Grove Property was not his homestead,[10] the Debtor did a complete about-face after this Court discovered the deception that he had committed on the Petition Date. The effect of the Debtor's most recent amendments, if all of them are allowed to stand, is that the creditors in the Debtor's individual case can look neither to the Elderberry Property as a source of payment (because it is no longer property of this estate) nor to the Belle Grove Property as a source of payment (because it is now exempt property).

This switching of positions is unconscionable to SOCA. With the Debtor's filing on November 30, 2015 of the Liao *dba*MIG Petition—which, it must be remembered, prevented SOCA from foreclosing on the Elderberry Property—and his designation of the Elderberry Property as his homestead, SOCA could at least look to the liquidation of the non-exempt Belle Grove Property for repayment of its secured claim against the Debtor (i.e., the Judgment).[11]

---

[10] At the December 15, 2015 hearing, this Court asked the Debtor's attorney the following question: "What's the address of the non-homestead?" [Hr'g Tr. 15:10–11, Dec. 15, 2015]. Counsel for the Debtor responded as follows: "The non-homestead is 3810 Belle, B-E-L-L-E, Grove Lane in Sugar Land." [Hr'g Tr. 15:12–13, Dec. 15, 2015].

[11] It must be remembered that SOCA holds a secured claim in the Debtor's case because prior to SOCA purchasing the Judgment from Mandalay, [Finding of Fact No. 16], Mandalay had abstracted the Judgment in Fort Bend County, Texas, [Finding of Fact No. 9]. Once the Judgment was abstracted, a lien attached to the Belle Grove Property pursuant to applicable state law. *Henderson v. Belknap (In re Henderson)*, 18 F.3d 1305, 1309 (5th Cir. 1994) ("Except as provided by Section 52.0011, a first or subsequent abstract of judgment, when it is recorded and indexed in accordance with this chapter, constitutes a lien on the real property of the defendant located in the county in which the abstract is recorded and indexed, including real property acquired after such recording and indexing.") (citing Tex. Prop. Code Ann. § 52.001). Thus, on the Petition Date, SOCA held a properly perfected non-purchase money lien on the Belle Grove Property.

Indeed, the Debtor's original and amended schedules in his personal case indicate that the Belle Grove Property has a value of $481,700.00, and has only tax liens on it totaling $13,926.07. [Finding of Fact No. 33]. Meanwhile, the amount owed under the Judgment is approximately $165,000.00. [*See* Findings of Fact Nos. 8 & 18].[12]  Thus, there is approximately $467,000.00 of equity in the Belle Grove Property, all of which can be used to pay the balance of the Judgment and at least a portion of the Debtor's unsecured claims.[13]  But now—having benefited from his false statements under oath and attempting to rectify his skullduggery by accurately scheduling the Elderberry Property in the MIG Pship case—the Debtor seeks to keep the Belle Grove Property from being used to pay SOCA and his other creditors by switching his homestead designation from the Elderberry Property to the Belle Grove Property.

"Such maneuvers are precisely those the [quasi-estoppel] doctrine aims at foreclosing." *Cox v. Cox (In re Cox)*, 292 B.R. 141, 148 (Bankr. E.D. Tex. 2003). As the Fifth Circuit, interpreting Texas Law on quasi-estoppel, has said: "Quasi estoppel 'was developed to prevent a party from retaining a benefit by asserting a position to the disadvantage of another and then asserting a right which is inconsistent with that previous position.' " *Neiman-Marcus Group, Inc. v. Dworkin*, 919 F.2d 368, 371 (5th Cir. 1990). The Debtor and his sibling partners obtained a benefit by the Debtor's assertion that as of November 30, 2015, he owned the Elderberry Property and that this property was his homestead. Specifically, the values of their respective

---

[12] The face amount of the Judgment is $419,694.06. However, through a pre-petition foreclosure sale on the Ranchester Property, the balance was reduced by $255,000.00 to $164,694.06. [Finding of Fact No. 18].

[13] The Debtor's original schedules, filed on December 11, 2015, represent that he has total assets of $1,650,423.84, and total liabilities of $9,522,996.20. [Doc. No. 8]. In his amended schedules filed on January 26, 2016, the Debtor represents that his total assets are $545,008.14 and his total liabilities are $9,527,404.80. [Doc. No. 66]. Thus, there is no question that the Debtor is woefully insolvent. That said, if the Debtor's exemption of the Belle Grove Property stands, then creditors in the Debtor's case will receive much less than if this property is non-exempt. If the Belle Grove Property is determined to be a non-exempt asset, then the $467,000.00 can be used to pay the remaining balance owed to SOCA under the Judgment as well as some modicum of the claims held by the unsecured creditors.

interests in MIG Pship were preserved because the Elderberry Property was **not** foreclosed upon. With the substantial equity existing in the Elderberry Property (approximately $660,000.00) and the relatively small amount of aggregate debt that the MIG Pship estate has,[14] the benefit was material.[15]

Meanwhile, the Debtor's illegal thwarting of the scheduled foreclosure sale of the Elderberry Property put—and still puts—SOCA at a disadvantage in two respects. First, with the foreclosure sale having been stopped, SOCA's exercise of its legitimate state-law remedies was thwarted, and SOCA now finds itself having to spend time and attorneys' fees in the MIG Pship case, as the Elderberry Property is now property of the MIG Pship bankruptcy estate subject to the control of the trustee in that case.[16]

Second, the Debtor's assertion now that he has a right to exempt the Belle Grove Property in his personal case puts SOCA at a distinct disadvantage because if the Debtor's amended exemption is allowed to stand, then the valid non-purchase money lien that SOCA had on the Belle Grove Property when the Debtor filed his initial schedules would be extinguished as a matter of law. *In re Napier*, 144 B.R. 719, 726 (Bankr. W.D. Tex. 1992) ("[U]nder the Texas homestead laws, the Defendant's lien on Tract One is invalid to the extent that it secures non-purchase money debt."); *Equitable Mortgage Co. v. Norton*, 10 S.W. 301, 304 (Tex. 1888) ("As

---

[14] *See supra* note 9.

[15] It is likely that the Debtor's interest in the MIG Pship, which is now an asset of his personal bankruptcy estate, will eventually be liquidated to help pay his creditors—thereby depriving the Debtor of the benefit that he obtained by illegally thwarting the foreclosure sale on the Elderberry Property that was scheduled to be held on December 1, 2015. But, as of the Petition Date, the Debtor—who had hidden the existence of the MIG Pship and his interest in this partnership, [*see* Findings of Fact Nos. 25 & 28]—retained his partnership interest, and it was definitely a benefit to him at the time. Moreover, his actions have definitely preserved a substantial portion of the value of the interests that the Siblings have in the MIG Pship; and because they themselves are not in bankruptcy, these benefits are not at risk of being lost.

[16] The trustee in the MIG Pship case (case number 15-36276) is a different trustee than the Trustee in the Debtor's individual case (case number 15-36257). The MIG Pship case has a different set of creditors than the Debtor's individual case and, therefore, it is necessary to have two separate and distinct trustees administering the respective assets of these two estates.

the constitution denounces as invalid all liens upon the homestead save purchase money, or for improvements made thereon, whether created by the husband alone or together with his wife . . . the lienholder cannot rely upon such mortgage or trust deed attempting to give a lien."). The Debtor's position now is completely inconsistent with the position that the Debtor, through his attorney, McClure, expressed to this Court at the hearing held on December 15, 2015:

| | |
|---|---|
| The Court: | What's the address of the non-homestead? |
| McClure: | The non-homestead is 3810 Belle, B-E-L-L-E, Grove Lane in Sugar Land. |
| The Court: | How far away or how close in proximity is 3810 to the homestead? |
| The Debtor: | It's about five to seven minutes' drive. |
| The Court: | All right. Thank you. |
| McClure: | Uh-huh. |
| The Court: | **And so the Judgment Lien, you're not going to be seeking an invalidation of the Judgment Lien on the non-homestead property, are you?** |
| McClure: | **No, sir, of course not.** |

[Hr'g Tr. 15:10–23, Dec. 15, 2015] (emphasis added).

Not only is SOCA at a disadvantage here; so are the unsecured creditors in the Debtor's personal case for whose interests the Trustee has a fiduciary duty to look out after. *Matter of Troy Dodson Const. Co., Inc.*, 993 F.2d 1211, 1216 (5th Cir. 1993) ("The trustee owes a fiduciary duty to all the creditors, not just to the unsecured creditors."); *In re Poage*, 92 B.R. 659, 662 (Bankr. N.D. Tex. 1988) ("Although a Chapter 7 trustee is a fiduciary obligated to treat all parties fairly, his primary duty is to the estate's unsecured creditors."). If the Belle Grove Property is allowed to be exempt, then the Trustee will be unable to sell this asset and use any remaining proceeds (after payment of the lien held by SOCA) to pay unsecured claims. Thus, the Trustee stands in the same position as SOCA: she—or, more accurately, the unsecured creditors of the Debtor—will suffer as much as SOCA, while the Debtor, still benefiting (along

with the Siblings) from his improper stopping of the foreclosure sale on the Elderberry Property,
gets to keep the Belle Grove Property for himself.

In sum, the Debtor here is just like the debtor in *Davidson.* The latter obtained a benefit
by receiving tax deductions through representing that his monthly payments to his ex-wife were
"alimony." *Davidson*, 947 F.2d at 1297. Then, when he filed his bankruptcy petition, in order to
obtain a discharge of these obligations, the debtor represented that the monthly payments were
not "alimony," but rather a "property settlement." *Id.* at 1296. The Fifth Circuit held that "[t]o
uphold the discharge of those payments . . . would reward an admitted manipulation tantamount,
at best, to deception." *Id.* at 1297. In the case at bar, when the Debtor filed the second petition
on November 30, 2015 (initiating case number 15-36276), he falsely represented that he owned a
d/b/a named "Master Investment Group" in order to stop the foreclosure sale scheduled for
December 1, 2015 on the Elderberry Property. [Findings of Fact Nos. 25 & 26]. Then, having
falsely represented that he personally owned the Elderberry Property, the Debtor claimed the
Elderberry Property as his homestead to ensure that neither SOCA nor other creditors could look
to this property for payment of their claims. Thus, the Debtor's actions preserved the value of the
ownership interests that the Siblings and he have in MIG Pship. Having benefited from illegally
stopping the foreclosure sale, the Debtor now takes a position wholly inconsistent with his initial
position that he owned the Elderberry Property and that it was his homestead. Now, his position
is that he does not own the Elderberry Property and that the Belle Grove Property is his
homestead. His present position deprives the Debtor's estate from having any non-exempt assets
that can be liquidated to pay the claims of his creditors. For this Court to uphold the Debtor's
amended homestead exemption would—to use the Fifth Circuit's language—"reward an
admitted manipulation tantamount, at best, to deception."

In sum, for all of the reasons set forth above, this Court finds that, applying the quasi-estoppel doctrine under Texas law, the Debtor is barred from amending his Schedule C to claim the Belle Grove Property as his homestead.

## V. CONCLUSION

This Court is acutely aware of the extensive protection given to homesteads under Texas law. *See e.g., McDaniel*, 70 F.3d at 843. *Siegel* further insulates double-dealing debtors from losing their homesteads, as the Supreme Court has held that the Code does not confer "a general equitable power in bankruptcy courts to deny exemptions based on a debtor's bad-faith conduct." 134 S.Ct. at 1196. Thus, a bankruptcy court may no longer use its § 105(a) powers to deny a bad-faith debtor his or her homestead exemption.

Nevertheless, *Siegel* did leave the door open for an exemption to be denied for bad-faith conduct where applicable state law so allows. In Texas, such law does exist: "Misrepresentations by a homestead claimant may, under the proper circumstances, create an estoppel to claim the homestead exemption." *Bland*, 810 S.W.2d at 283. In the case at bar, the Debtor lied under oath—asserting that he owned the Elderberry Property and that it was his homestead—and by doing so, he and his three siblings benefited therefrom to SOCA's disadvantage. Now, the Debtor disavows these assertions and takes the position that the Belle Grove Property is his homestead, which puts SOCA and the Trustee (or, more specifically, the creditors for whom she is administering the estate) at a huge disadvantage by depriving them of a significant and valuable asset that can be used to pay claims. Under these circumstances, the doctrine of quasi-estoppel under Texas law bars the Debtor from claiming the Belle Grove Property as his homestead. Accordingly, this Court sustains SOCA's Objection and the Trustee's Objection.

An order consistent with this Memorandum Opinion will be entered on the docket simultaneously herewith.

Signed this 15th day of July, 2016

Jeff Bohm
United States Bankruptcy Judge